801 So.2d 783 (2001)
GREENWOOD UTILITIES and Mississippi Municipal Workers' Compensation Group, Appellants
v.
Charles WILLIAMS, Appellee.
No. 2000-WC-00138-COA.
Court of Appeals of Mississippi.
December 11, 2001.
*786 Diane V. Pradat, Jackson, Attorney for Appellants.
Charlie Baglan, Lawrence J. Hakim, Batesville, Attorneys for Appellee.
Before SOUTHWICK, P.J., BRIDGES, and CHANDLER, JJ.
SOUTHWICK, P.J., for the Court.
¶ 1. The Workers' Compensation Commission found that Charles Williams had a permanent partial disability and awarded benefits. On appeal here, the employer Greenwood Utilities argues that Williams had no permanent loss of wage earning capacity or at least that it was not a fifty-five percent loss. In addition, it is alleged that one of Williams' witnesses was not properly disclosed prior to the hearing and that the evidence did not support that Williams experiences post-traumatic stress disorder. We disagree and affirm.

STATEMENT OF FACTS
¶ 2. Charles Williams was employed by Greenwood Utilities as a maintenance helper. While working for Greenwood on December 1, 1992, Williams was electrocuted when the jackhammer he was using broke through a concrete conduit and came into contact with charged electrical cables. Williams suffered second and third degree electrical burns to his face, hands, thighs, and feet. Williams underwent several skin grafts. Sometime after being released from the hospital, Williams returned for an additional skin graft procedure after a previous graft proved to be unsuccessful. Prior to his injuries, Williams also had a part-time position at Mississippi Printing Company.
¶ 3. On November 23, 1994, Williams filed a petition to controvert at the Commission alleging an injury in the scope and course of employment. Greenwood filed an answer admitting the injury was compensable but denying that Williams was temporarily disabled, permanently disabled, or that Williams suffered any loss in wage earning capacity.
¶ 4. The parties stipulated to the following: (1) that a compensable injury occurred, (2) that Williams' average weekly wage on the date of the injury was $225, (3) that Williams' average weekly wage had he continued to work at Greenwood would be approximately $300, (4) that from December 2, 1992 to April 4, 1993, Greenwood paid temporary benefits of $2,658.56, (5) that the maximum medical improvement date was January 19, 1996, and (6) that Williams' wife, if she testified, would corroborate her husband's testimony. It was also uncontested that Williams was by the date of the hearing working for a printing company at a wage higher than he was earning at Greenwood.
¶ 5. The only witnesses to appear at the hearing were Williams and James C. Horne, Jr. Williams' treating physician, Dr. Robert Love, testified through a deposition that Williams was able to return to work on a limited basis on March 30, 1993. Love required that Williams prop his feet up fifteen minutes of each hour in order to *787 increase circulation in his lower legs, a restriction that should have lasted for six months. Love also instructed Williams that he was to avoid working in temperatures below thirty-two degrees and above eighty degrees Fahrenheit. Williams continued to see Love until January 19, 1996, the date Love determined that Williams had reached maximum medical recovery. Love assessed Williams as having a twenty percent permanent partial impairment rating to the body as a whole. Half of the permanent partial impairment rating was attributed to Williams' continued complaints of pain and the other half to Williams' limited ability to cope with temperature change. Love determined that Williams would need medical treatment for the rest of his life as a result of the burns.
¶ 6. Love referred Williams to Dr. Gilbert MacVaugh, a clinical psychologist. MacVaugh first examined Williams on April 25, 1993. MacVaugh diagnosed Williams as suffering from post-traumatic stress disorder, a condition caused by the electric shock. Williams continued to see MacVaugh until August 1994 at which point MacVaugh determined that Williams could gain no further benefit from treatment. MacVaugh saw Williams next on April 5, 1997, shortly before the hearing, and found that Williams did not exhibit many symptoms of post-traumatic stress disorder.
¶ 7. Greenwood submitted the deposition testimony of Dr. MacVaugh, Williams' W-2 forms from 1993 to 1996 and a 1997 wage statement. At the conclusion of the hearing, the administrative judge requested that the parties submit briefs. Greenwood submitted a brief, and Williams instead submitted a proposed order. The administrative judge adopted that proposed order, perhaps verbatim, on September 22, 1997. The Commission adopted that same order and affirmed.
¶ 8. The order was quite detailed. In it, Williams was found to have a permanent-partial medical impairment of twenty percent, to suffer from post-traumatic stress disorder but that malady did not contribute to the permanent-partial medical impairment or loss of wage earning capacity, and to be unable to perform his pre-injury employment. The Commission found that Williams suffered a loss in wage earning capacity. His post-injury earnings would be thirty to forty percent higher if not for his injuries. Moreover, even that lower wage was partially due to his current employer's generosity, making his actual loss of capacity greater than thirty or forty percent. The Commission found that Williams suffered a fifty-five percent loss of wage earning capacity because of his injuries.
¶ 9. Permanent partial disability benefits were awarded, beginning on March 31, 1993, and continuing for 450 weeks. Greenwood was also ordered to provide medical services and supplies necessary for Williams' injuries including the post-traumatic stress disorder. The Circuit Court of Leflore County affirmed. It is from this judgment that Greenwood appeals here.

DISCUSSION

1. Effect of Commission's adopting a litigant's proposed order
¶ 10. The administrative judge and later the Commission adopted an order prepared by Williams' attorney. Greenwood argues that the administrative judge "did not change or add one word to the proposed Order." Williams does not appear to disagree with this factual contention, stating in his brief that "the Administrative Judge rendered an Order adopting the proposed Order submitted" by Williams' attorney. Williams states that "the Administrative *788 Judge invited a proposed order from the Appellants as well which is a long-standing practice of the Mississippi Worker's Compensation Commission." What the record reveals is a request by the administrative judge for briefs, which may in the practice of the Commission equally invite proposed orders.
¶ 11. More explanation of what occurred was made at the hearing on appeal in circuit court. Williams' attorney asserted that two of the Commissioners at the hearing before the Commission stated that it was "common practice ... for attorneys to submit proposed orders."
¶ 12. Normally, the findings of the Workers' Compensation Commission are subject to deferential review. This Court is only "to determine whether there exists a quantum of credible evidence which supports the decision of the Commission." Hale v. Ruleville Health Care Ctr., 687 So.2d 1221, 1224 (Miss.1997). Furthermore, this Court is not "to determine where the preponderance of the evidence lies when the evidence is conflicting, given that it is presumed that the Commission, as trier of fact, has previously determined which evidence is credible and which is not." Hale, 687 So.2d at 1224-25.
¶ 13. There are situations in which usual appellate deference is inapplicable. One instance is if a trial judge merely adopts the proposed findings of fact and conclusions of law of a litigant. Omnibank of Mantee v. United Southern Bank, 607 So.2d 76, 82-83 (Miss.1992). In that case, the Supreme Court stated that "we have no choice but to `engage in much more careful analysis of adopting findings than in cases where the findings and conclusions have been authorized by the trial judge himself.'" Omnibank, 607 So.2d at 83. The Supreme Court stated that "[w]e must keep a keen eye for gratuitous slants," and that "our duty of `deference to such findings is necessarily lessened.'" Id. "At the very least, we may assume such findings have given the party drafting them the benefit of the favorable inferences that may be found in the facts." Id.
¶ 14. The Commission, as the ultimate finder of fact, is akin to a trial judge sitting without a jury. The rule of Omnibank has been applied in both civil and criminal matters. See In re Estate of Grubbs, 753 So.2d 1043, 1046-47 (Miss. 2000) (heirship), Brooks v. Brooks, 652 So.2d 1113, 1118 (Miss.1995) (divorce), and Billiot v. State, 655 So.2d 1, 12 (Miss.1995) (competency hearing). We find no decision in which the Supreme Court has found similar considerations to apply when reviewing the decision of an administrative agency. Nonetheless, we find the rationale of the rule to be equally applicable.
¶ 15. We therefore hold that when there is convincing evidence that the administrative judge has adopted all but verbatim the proposed findings of a party, and the Commission then adopted those findings, we "must view the challenged findings of fact and the appellate record as a whole with a more critical eye to insure that the [Commission] has adequately performed its function." Omnibank, 607 So.2d at 83. We are in no way rejecting the findings, but neither are we uncritically accepting all that is contained within them. That one party's counsel was able to prepare an eighteen page set of detailed findings and conclusions, without the administrative judge having given any direction at the end of the hearing as to her views on any issue, and having none of those findings altered once they were presented to the judge, at least suggests that a critical look by this Court is appropriate.

2. Inability to perform Pre-Injury Employment
¶ 16. The Commission found that Williams has a 20% permanent-partial *789 medical impairment rating. He also was found to suffer from post-traumatic stress disorder which by itself has not resulted in any permanent impairment, but did cause him to be unable to perform his pre-injury employment. Thus Williams' refusal to return to Greenwood was found to be justified.
¶ 17. Greenwood argues that the Commission erred in finding that Williams was unable to perform his pre-injury employment. It relies on Dr. Love's restriction that Williams elevate his feet for fifteen minutes of each hour, a six-month restriction that long ago expired. However, Love also told Williams to avoid working in temperatures below thirty-two degrees and above eighty degrees Fahrenheit. At the low temperatures, Williams would experience pain akin to that experienced by those suffering from arthritis. At high temperatures, he would be at risk of developing abscesses beneath the skin grafts. Love testified that seventy percent of individuals who did not avoid working in extremely hot or cold temperatures would have breakdowns in skin grafts and in surrounding tissue. Thus there was medical testimony that Williams had continued pain, was unable to stand for long periods of time, and could not work in extreme cold and heat.
¶ 18. Williams testified that Greenwood offered him the same position he held when he was injured, without any discussion of modifying his former employment duties. He refused to return to Greenwood because he was afraid to do so. Williams testified that his position at Greenwood as a maintenance helper required him to work at least part of the time outdoors year-round.
¶ 19. Williams also testified that he continued to experience pain, that his feet would become swollen because of poor circulation due to the skin grafts, that he could not stand for long periods of time, and his hands would become stiff when he worked with them for extended periods of time. When asked whether he could go back to work full-time at Greenwood, Williams responded that he did not believe so because "I [have] too big a hole in my feet, and I just can't stand."
¶ 20. We find substantial evidence to support that Williams could not return to his former duties.

3. Testimony of James C. Horne, Jr.
¶ 21. Greenwood argues that the administrative judge abused her discretion by allowing James C. Home, Jr. to testify at the administrative hearing despite the fact Horne was not listed as a witness in any pre-hearing memoranda. Williams filed three pre-hearing memoranda. In each, Williams identified a "James C. Horne" employed by Greenwood. This "James C. Horne" is James C. Horne, Sr., who never was called to testify. His son, James C. Horne, Jr., never worked for Greenwood, but was Williams' supervisor at both Mississippi Printing and Spectrum Printing.
¶ 22. According to a Commission rule, "each party must submit a prehearing statement ... and set forth: ... [the][n]ame and address of each lay witness except those to be called for impeachment or rebuttal purposes," and "[f]ailure of the claimant to timely file the prehearing statement may result in the dismissal of the case or other sanctions." Miss. WORKERS' COMP. COMM. PROC. RULE 5. Procedural Rule 8 states that "[i]n compensation hearings the general rules of evidence shall be relaxed so as to permit the introduction of any relevant and competent evidence." Failure to identify the correct Horne was a violation of the Commission's procedural rules. His testimony was essential *790 to Williams' case since he provided evidence on the issue of whether Williams currently was suffering a loss of wage earning capacity.
¶ 23. We start with acknowledging that an administrative judge is vested with discretion to determine the proper procedural flexibility under its rules.
We emphasize that the Commission is an administrative agency, not a court. It has broad discretionary authority to establish procedures for the administration of compensation claims. It has like authority to relax and import flexibility to those procedures where in its judgment such is necessary to implement and effect its charge under the Mississippi Workers' Compensation Act. It is a rare day when we will reverse the Commission for an action taken in the implementation and enforcement of its own procedural rules.
Delta Drilling Co. v. Cannette, 489 So.2d 1378, 1380-81 (Miss.1986).
¶ 24. Greenwood did not allege in its brief specifically in what manner it was prejudiced. While it is true that Greenwood may have been surprised by the fact that James C. Home, Jr. was the witness who ultimately appeared at the administrative hearing, Greenwood should not have been surprised that evidence would be presented concerning Williams' loss of wage earning capacity. Greenwood was put on notice with the filing of the petition to controvert that "the degree and extent of permanent disability" would be an issue at the hearing. The loss of wage earning capacity is one aspect of permanent disability. Thus Greenwood needed to be prepared to indicate to what extent, if any, it believed Williams had suffered a loss of wage-earning capacity. Without a showing of what, if anything, Greenwood would have done differently had it known Home would testify on the issue, we find no abuse of discretion in allowing the testimony.

4. Loss of Wage Earning Capacity
¶ 25. Williams was making more money at the time of the 1997 hearing than when he was injured in 1992. The Commission found that he successfully rebutted the presumption of no loss in wage earning capacity that thereby arose, and instead had suffered a fifty-five percent loss. Greenwood alleges that this was error.
¶ 26. It was stipulated by both parties that Williams had been earning $5.25 an hour or $225 per week at Greenwood at the time of his injury. It was also stipulated that had Williams still been employed with Greenwood at the time of the hearing that he would have been making $6.38 an hour. Williams testified that when he began working full-time at Mississippi Printing Company in April 1993, that he was making $5.50 an hour. Williams began part-time work at Spectrum Printing Company in August 1996. His wages for 1996 were $362.75 per week when working at both Mississippi Printing and Spectrum Printing. He was earning between $6.50 and $7.00 per hour.
¶ 27. At the circuit court hearing in this matter, Williams' attorney was asked how the fifty-five percent figure was derived. His response was as follows:
Your Honor, all the findings of lost wage earning capacityand it is espoused by Dunnare arbitrarily picked by the Administrative Judge and then reviewed by the Full Commission for their accuracy. I prepared the proposed order, which counsel opposite [also] could have done had they so chose. I found in the order that the claimant had lost approximately 55 percent of his wage earning capacity....
*791 This explanation by Williams' attorney is telling. This attorney, preparer of the order that the administrative judge later signed, appeared to admit to selecting an arbitrary, and high, figure for loss of wage-earning capacity and then inserting it into the order. Though percentage of loss has aspects of arbitrariness, since the precise extent to which an injury has limited a person is not subject to mathematical precision, the percentage is supposed to be a determination of fact left largely to the discretion of the Commission, not the discretion of a party. We cast a more critical eye upon the Commission's findings to ensure that there was no abdication of responsibilities as the finder of fact.
¶ 28. A person's entitlement to benefits under the workers' compensation scheme is based by statute on the difference in wage-earning capacity before and after injury:
In all other cases ... of disability, the compensation shall be sixty-six and two-thirds percent (66-2/3%) of the difference between his average weekly wages, subject to the maximum limitations as to weekly benefits as set up in this chapter, and his wage-earning capacity thereafter in the same employment or otherwise, payable during the continuance of such partial disability, but subject to reconsideration of the degree of such impairment by the commission on its own motion or upon application of any party in interest. Such payments shall in no case be made for a longer period than four hundred fifty (450) weeks.
Miss.Code Ann. § 71-3-17(c)(25) (Rev. 2000).
¶ 29. This determination of loss of capacity, though, "is not necessarily related to a comparison of actual wages before and after the accident." VARDAMAN S. DUNN, MISSISSIPPI WORKMEN'S COMPENSATION, § 67 (3rd. ed.1982). The "[d]egree of disability is calculated under most acts by comparing actual earnings before the injury with earning capacity after the injury," and it "is at once apparent that the two items in the comparison are not quite the same." Karr v. Armstrong Tire & Rubber Co., 216 Miss. 132, 137, 61 So.2d 789, 792 (1953). There is a difference, logical and necessary, between the capacity to earn wages and the actual wages that are being earned at any particular time. In deciding the level of disability, the goal is "to determine the wage that would have been paid in the open labor market under normal employment conditions to claimant as injured, taking wage levels, hours of work, and claimant's age and state of training as of exactly the same period used for calculating actual wages earned before the injury." Karr, 216 Miss. at 139, 61 So.2d at 792.
¶ 30. The presumption that no loss of wage earning capacity has occurred applies when actual wages after the injury are the same or higher than before injury. Spann v. Wal-Mart Stores, Inc., 700 So.2d 308, 313 (Miss.1997). As most presumptions, it may be rebutted. A non-exclusive list of considerations is this: "increase in general wage levels since the time of accident, claimant's own greater maturity and training, longer hours worked by the claimant after the accident, payment of wages disproportionate to capacity out of sympathy to claimant, and the temporary and unpredictable characteristics of post-injury earning." Id.
¶ 31. The decision as to the loss of wage earning capacity "is largely factual and is to be left largely to the discretion and estimate of the commission." DUNN. MISSISSIPPI WORKMEN'S COMPENSATION, LAW AND PRACTICE RULES AND FORMS. § 68 (3rd. ed.1982). The "incapacity to earn wages and the extent thereof `must be supported by medical findings,' *792 but the requirement is met when the fact and extent of incapacity is corroborated in part by medical testimony." Id. at § 70. However, "[m]edical findings are not the exclusive basis for the determination, and the commission is required to consider all of the testimony and all of the pertinent factors, including physical or functional disability from the medical viewpoint and any demonstrated impairment of the claimant's capacity to secure and retain employment and perform the work for which he is qualified." Id.
¶ 32. The presumption of no loss of wage earning capacity arose here. The Commission concluded that Williams rebutted it based on the testimony of James C. Horne. Home, his current supervisor, stated that Williams was working at only seventy percent of his pre-injury capacity. The Commission also found that Williams was employed at Spectrum Printing because of his loyalty and faithfulness "as well as to [Spectrum's] largess." When asked why he continues to employ Williams in light of his reduced productivity, Home testified Williams is present when needed "and the fact that I do have a certain amount of loyalty to him because I've known him for awhile .... [a]nd I can afford it right now." Home added that although he may be able to afford Williams now that "there may come a time when I don't have enough hours in the day to do that, and when that happens, then I may have to make a decision." Horne testified that Williams was making between $6.50 or $7.00 an hour while others in his same position were earning $10.00 an hour, although it must be noted that those individuals had been there longer than Williams.
¶ 33. The Commission, adopting the findings prepared by Williams' attorney, stated that "the evidence is uncontradicted that [Williams] is performing his current work at approximately 30% less capacity than he was prior to his injury and that he is totally disabled from performing the work of [Greenwood] herein and that as a result his actual wage level has suffered." The Commission found that Williams suffered a fifty-five percent loss in wage earning capacity because of his "medical impairment,... his ability to perform at his pre-injury level ..., his complaints of pain and stiffness and need to elevate and rest his lower extremities every four hours, Dr. Love's 20% permanent impairment rating, [Williams'] work history, and his age and education...."
¶ 34. Williams testified that he had only a tenth grade education. His two jobs prior to working for Greenwood were at a construction company removing old telephone lines and with a cotton trailer company. Williams testified that the only job training that he had received prior to his employment with Greenwood was in the operation of metal lathes, a skill which Williams testified that he has been unable to use.
¶ 35. The Commission considered factors enumerated in Spann but also other relevant matters. "Where there is substantial, although disputed, evidence supporting the commission's findings that the presumption was or was not overcome, we are required to affirm the commission's judgment." General Elec. Co. v. McKinnon, 507 So.2d 363, 365 (Miss.1987). We agree that the evidence was substantial that Williams had some loss of wage earning capacity. The problem here is that originally this fifty-five percent loss was his attorney's arbitrary number. There is no source for that number in the evidence. There was evidence from the surprise witness Home that Williams was being paid thirty percent less than other workers. He also testified that this was a somewhat gratuitous wage level, one that might not be maintained in the future. Williams' *793 ability to earn even thirty percent less than his prior wage-earning capacity if he were terminated at Spectrum was brought into question.
¶ 36. Despite the unfortunate total control over the phrasing of the decision that was apparently exercised by the attorney, we find that the matter of the specific loss of wage earning capacity cannot be treated as just one of the "gratuitous slants" that might have been injected by counsel. Omnibank, 607 So.2d at 83. This was the central issue in the case. We will not assume that the administrative judge failed to consider whether she agreed with this number. There is also evidence that the Commission had the source of the draft findings brought to its attention, and nonetheless it too accepted this number. We find that acceptance must have been knowing and intentional.
¶ 37. We affirm the Commission's acceptance of the finding that Williams effectively rebutted the presumption that he suffered no loss in wage earning capacity and that Williams suffered a fifty-five percent loss of wage earning capacity.

5. Post-Traumatic Stress Disorder
¶ 38. The Commission found that Williams continues to suffer from post-traumatic stress disorder. Greenwood was ordered by the Commission to provide "reasonable and necessary medical services and supplies for [Williams'] work-related post-traumatic stress disorder." Williams discontinued his treatment for the disorder in August of 1994 and did not see Dr. MacVaugh again until April 1997. MacVaugh testified that treatment was discontinued in 1994 because it was decided by both MacVaugh and Williams that Williams could derive no further benefit from it. MacVaugh also testified that at the 1997 meeting the only symptom of post-traumatic stress disorder that Williams exhibited was that he was unable to sleep at night and that this symptom alone was not enough to suggest existence of the disorder.
¶ 39. However, Dr. Love testified at his deposition that there was a greater than fifty-percent chance that Williams would need further psychiatric care. Dr. Love based his opinion on his years of experience treating burn patients. Williams also testified that he still experienced flashbacks, nightmares, and had difficulty sleeping several nights a week.
¶ 40. We find that there is substantial evidence, although it may be conflicting, to support the Commission's finding that Williams continues to suffer from post-traumatic stress disorder and may require future treatment. This assignment of error is without merit.

6. Amending of Petition to Controvert
¶ 41. Williams amended his petition to controvert to include post-traumatic stress disorder almost three years after the initial petition was filed. The original petition was filed on November 23, 1994. The motion to amend was filed March 3, 1997. A hearing in this matter had been set three times prior to the motion. Greenwood noted in its response to Williams' motion to amend that the hearing had been continued or cancelled each time at the request of Williams.
¶ 42. The amendment of pleadings in workers' compensation matters should be "liberally allowed so that the truth may be ascertained." Crump v. Fields, 251 Miss. 864, 871, 171 So.2d 857, 859 (1965). We find the amendment here to be appropriate.
¶ 43. THE JUDGMENT OF THE CIRCUIT COURT OF LEFLORE COUNTY IS AFFIRMED. ALL COSTS *794 OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, IRVING, MYERS, CHANDLER and BRANTLEY, JJ., CONCUR.