IRVING, J.,
 

 for the Court.
 

 ¶1. HTC Healthcare II, Inc. (HTC), George County Hospital (GCH), and Del-co, Inc., submitted competing applications for a certificate of need (CON) to the Mississippi State Department of Health (the Department) to construct a sixty-bed skilled nursing facility in George County. The Department granted the CON to GCH, and HTC appealed the decision to the Chancery Court of Hinds County. The chancery court affirmed the decision of the Department, and HTC has now lodged this appeal, contending that the chancery court erred in affirming the Department’s decision because of a lack of substantial evidence to support the Department’s finding that GCH’s application was superior to HTC’s in two areas: the per diem cost to Medicaid and the construction costs.
 

 ¶ 2. Finding no reversible error, we affirm.
 

 FACTS
 

 ¶ 3. In June 2002, GCH, HTC, and Del-co, Inc. d/b/a Glen Oaks Nursing Home (Glen Oaks) filed competing CON applications to build a sixty-bed skilled nursing facility in George County. GCH filed its initial application on June 3, 2002, followed by a supplementation on June 28, 2002. Neither Glen Oaks nor HTC filed a supplementation to its application. The applications were deemed complete on July 1, 2002. The Department used comparative review criteria, as outlined in the Mississippi Certificate of Need Review Manual (CON Manual) to assist it in determining which application contained the most cost-effective proposal. Cost effectiveness was a major consideration for the Department in making the selection. We quote the applicable section of the CON Manual as follows:
 

 
 *696
 
 Competing Applications: The factors which influence the outcome of competition on the supply of health services being reviewed. Determination will be made that the entity approved is the most appropriate applicant for providing the proposed health care facility or service. Such determination may be established from the material submitted as to the ability of the person, directly or indirectly, to render adequate service to the public. Additional consideration may be given to how well the proposed provider can meet the criteria of need, access, relationship to existing health care system, availability of resources, and financial feasibility. In addition, the Department may use a variety of statistical methodologies, including but not limited to, “market share analysis,” patient origin data, and state agency reports.
 
 In the matter of competing applications for nursing facility beds, the Department will conduct a comparative analysis and make a determination based upon a ranking of all competing applications according to the following factors: size of facility; capital expenditure; cost per square foot; cost per bed; staffing; medicare utilization; total cost to medicaid; per diem cost to medicaid; continuum of care services; and community support. Each factor■ shall be assigned an equal weight. The application obtaining the lowest composite score in the ranking will be considered the most appropriate application.
 

 (Emphasis added).
 

 ¶ 4. In determining which applicant received the lowest composite score, the Department followed the dictates of the CON Manual, and its staff conducted a comparative analysis of the competing applications. The staff analysis was performed by the Department’s Division of Health Planning and Resource Development (the Division). The Division determined that GCH had the lowest composite score and recommended that the Department grant the CON to GCH. Specifically, the Division determined that GCH obtained a composite score of eleven, that HTC obtained a score of thirteen, and that Glen Oaks obtained a score of twenty-four. The specific factors considered and rated were size in square feet, capital expenditure, cost per square foot, cost per bed, staffing and annual costs for first year, Medicare utilization percentage, first year cost to Medicaid, first year per diem cost to Medicaid, continuum of care services, and a signed agreement that the applicant will operate the nursing facility for a minimum of three years following licensure.
 

 ¶ 5. Following the Division’s recommendation, HTC, pursuant to Mississippi Code Annotated section 41-7-197(2) (Rev.2005), requested, and was granted, a review hearing. Following the hearing, the hearing officer adopted verbatim GCH’s proposed findings of fact and conclusions of law and recommended approval of GCH’s application. The Department accepted the recommendation and issued the CON to GCH.
 

 ¶ 6. HTC appealed the decision to the Chancery Court of Hinds County. After hearing argument from both sides, the chancery court affirmed the findings of the Department in all particulars, except the Department’s finding with respect to the first year cost to Medicaid. It appeared to the chancery court that the Department had utilized two different figures for the first year personnel costs: $931,892 in GCH’s original application and $1,025,081 in GCH’s supplement to its original application. Therefore, the chancery court remanded the matter to the Department to ascertain the accurate dollar amount for the first year personnel costs and to assess
 
 *697
 
 the appropriate points accordingly.
 
 [1]
 

 ¶ 7. On remand, the Department conducted a hearing on the sole issue of the first year cost to Medicaid. Following the hearing, the hearing officer determined that the Department and GCH had properly calculated the Medicaid per diem rate and that the initial ranking of the applicants remained unchanged. The hearing officer recommended that the CON be awarded to GCH. The Department concurred and certified the proceedings on remand to the chancery court, which affirmed the decision of the Department. It is from this final affirmance of the Department’s decision that HTC has prosecuted this appeal.
 

 ¶ 8. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 ¶ 9. We note at the outset that appellate courts are governed by a strict standard of review when reviewing decisions of administrative agencies.
 
 Miss. State Dep’t of Health v. Natchez Cmty. Hosp.,
 
 743 So.2d 973, 976(¶ 8) (Miss.1999). Mississippi Code Annotated section 41-7-201 (2)(f) (Rev.2005) provides in part that: Further, the Mississippi Supreme Court in
 
 Natchez Community Hospital,
 
 743 So.2d at 976(¶ 9) (quoting
 
 St. Dominic-Jackson Memorial Hospital v. Mississippi State Department of Health,
 
 728 So.2d 81, 83(¶ 9) (Miss.1998)), stated that “[t]he decision of the hearing officer and State Health Officer is afforded great deference upon judicial review by this court even though we review the decision of the chancellor.” In
 
 Natchez Community Hospital,
 
 the supreme court also noted that it had previously held that:
 

 The order shall not be vacated or set aside, either in whole or in part, except for errors of law, unless the court finds that the order of the State Department of Health is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the State Department of Health, or violates any vested constitutional rights of any party involved in the appeal....
 

 Our Constitution does not permit the judiciary of this state to retry de novo matters on appeal from administrative agencies. Our courts are not permitted to make administrative decisions and perform the functions of an administrative agency. Administrative agencies must perform the functions required of them by law. When an administrative agency has performed its function, and has made the determination and entered the order required of it, the parties may then appeal to the judicial tribunal to hear the appeal. The appeal is a limited one ... since the courts cannot enter the field of administrative agency. The court will entertain the appeal to determine whether or not the order of the administrative agency (1) was-supported by substantial evidence, (2) was arbitrary and capricious, (3) was beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party.
 
 Cook v. Mardi Gras Casino Corp.,
 
 697 So.2d 378, 380 (Miss.1997) (emphasis added) (quoting
 
 Mississippi Dep’t of Envtl. Quality v. Weems,
 
 653 So.2d 266, 273 (Miss.1995) quoting
 
 State
 
 
 *698
 

 Tax Comm’n v. Earnest,
 
 627 So.2d 313, 319 (Miss.1993)).
 

 Id.
 
 at (¶ 10).
 

 ¶ 10. HTC argues that this Court should not grant deference to the Department’s findings because “the Department exercised
 
 no
 
 discretion in drafting a considered opinion on the merits, but rather merely adopted verbatim the proposed opinion submitted by GCH.” The chancellor recognized that the hearing officer adopted verbatim GCH’s proposed findings of fact and conclusions of law and quoted
 
 Attala County Board of Supervisors v. Mississippi State Department of Health,
 
 867 So.2d 1019, 1021 n. 1 (Miss.2004), a case where a hearing officer also adopted verbatim the proposed findings of fact and conclusions of law that had been submitted by one of the candidates:
 

 [T]he State Health Officer (SHO) adopted verbatim the hearing officer’s report. The chancery court stated in its memorandum opinion and judgment that it was aware that the findings of fact and conclusions of law signed by the hearing officer were adopted verbatim from those prepared by Hughes’s counsel. Therefore, the chancery court applied a “heightened scrutiny” and “analyzed such findings with greater care,” citing
 
 Brooks v. Brooks,
 
 652 So.2d 1113, 1118 (Miss.1995);
 
 Omnibank v. United S. Bank,
 
 607 So.2d 76, 83 (Miss.1992);
 
 Greenwood Utils. v. Williams,
 
 801 So.2d 783, 788 (Miss. Ct.App.2001).
 

 ¶ 11. The chancellor concluded that “[wjhile this Court does not sanction this practice, in
 
 Attala County Bd. of Supervisors
 
 the Supreme Court recognized that the Hearing Officer also adopted verbatim the proposed findings of fact and conclusions of law and recommendation[.] In the case at bar, this Court has applied the same standard.” Thus, like the chancellor in
 
 Attala County Board of Supervisors
 
 and the chancellor in the case before us, we also apply a “heightened scrutiny,” as we sit as a second appellate court in review of the chancellor’s decision. Having established our standard of review, we now turn to the issues presented.
 

 1. Per Diem Cost to Medicaid
 

 ¶ 12. HTC also argues that the Medicaid per diem rate submitted by GCH in its CON application is not supported by substantial evidence. The comparative analysis indicates that GCH had the lowest Medicaid per diem rate at $69.50, while HTC had the second lowest rate of $73.20, and Glen Oaks the third, at a rate of $73.72. HTC claims that GCH’s rate is “wildly inaccurate” and argues that GCH’s Medicaid per diem rate is actually around $250, because GCH is eligible to receive additional Medicaid payments pursuant to an upper payment limit (UPL) as authorized by 42 C.F.R. § 447.272.
 
 [2]
 
 Thus, according to HTC, GCH should have been awarded three points in the Medicaid per diem rate category instead of one, and HTC should have been awarded one point instead of three, increasing GCH’s composite score to thirteen and reducing HTC’s composite score to twelve. There
 
 *699
 
 fore, HTC should have been awarded the CON, as it would have had the lowest composite score.
 

 ¶ 13. HTC further argues that GCH failed to take its eligibility for UPL payments into consideration when it computed its Medicaid per diem rate that was submitted with its application. HTC adamantly contends that the UPL regulation was in effect when GCH submitted its application, and GCH contends just as forcefully that the UPL regulation was not operational when the application was submitted.
 

 ¶ 14. The chancellor, in her opinion and order, found that:
 

 We agree with the Department, it would not be proper to reopen the application process due to changes which occur subsequently to the date of filing the applications. If [GCH] were required to continuously re-evaluate the applications, it would be impossible to cite a beginning and an ending period. Thus, no finality to the application process could be achieved.”
 

 ¶ 15. We have scoured the record and are unable to determine whether the UPL was in effect at the time that GCH submitted its application.
 
 [3]
 
 Although Cain, owner of HTC, testified at the review hearing that the UPL was adopted on June 18, 2002, we find nothing in the record to support this assertion. HTC introduced, as Exhibit 24, what appears to be an Internet photo copy of 42 C.F.R. § 447.272. The exhibit is entitled “MED-REG, MED-GUIDE ¶ 21,888.272, 42 C.F.R. § 447.272, Inpatient services: Application of upper payment limits.” At the end of the exhibit are several adopted and effective dates, without any explanation of what was being adopted and becoming effective on the various dates listed. It is perhaps reasonable to assume that the various dates represent sundry changes and amendments to the regulation over the span of time represented by the beginning and ending dates listed.
 

 ¶ 16. In its brief, HTC cites
 
 Ashley County Medical Center v. Thompson,
 
 205 F.Supp.2d 1026 (E.D.Ark.2002) for the proposition that the UPL regulation went into effect on May 14, 2002. Clearly, this assertion is not accurate. According to
 
 Thompson,
 
 UPLs were first implemented by Congress in 1981.
 
 Id.
 
 at 1032 n. 7. While we cannot be exactly sure of the UPL that HTC contends was ignored by GCH when GCH submitted its application, it appears that HTC is referring to a regulation known as the 2002 Upper Payment Limit Rule. It is this rule that, according to
 
 Thompson,
 
 became effective on May 14, 2002.
 
 Id.
 
 at 1029 n. 1. Again, according to
 
 Thompson,
 
 this rule “reduces the upper limit on what states may reimburse locally-owned public hospitals for services to Medicaid beneficiaries and still receive federal matching funds.”
 
 Id.
 
 at 1029 (footnote omitted).
 

 ¶ 17. It is very striking that, although HTC questioned Paul Gardner, the administrator of GCH, it did not ask Rachel Pittman, chief of the Department’s Division of Health Planning and Resource Development, a single question about the UPL during its interrogation of Pittman regarding the first year per diem cost to Medicaid. It would not be unreasonable to
 
 *700
 
 assume that HTC knew that whatever answers that she would give would not be favorable to its position. Otherwise, it is hard to imagine that HTC would overlook the one person in the Department that should have known all about UPLs. After all, it was Pittman who oversaw or supervised the compilation of the staff analyses.
 

 ¶ 18. Also, and possibly more pertinent on this issue than anything, is the fact that the Division of Medicaid, independent of the staff analyses performed by the Department’s Division of Health Planning and Resource Development,
 
 [4]
 
 projected a per diem rate for all applicants. The Division of Medicaid determined that the per diem first year cost to Medicaid for GCH would be $109.55; for HTC, the cost would be $110.62; and for Glen Oaks, the cost would be $102.95. The analyses performed by the staff determined that the per diem first year cost to Medicaid for GCH would be $69.50; for HTC, the cost would be $73.20; and for Glen Oaks, the cost would be $73.72. The importance of the independent rating by the Division of Medicaid is twofold. First, with this rating, both HTC and GCH gain a point, leaving HTC with a composite score of fourteen and GCH with a composite score of twelve. Second, it is obvious that the Division of Medicaid considered some costs, reimbursable under the Medicaid formula, that were greater than what either HTC or GCH indicated in their respective applications.
 

 ¶ 19. Given the different rating by the Division of Medicaid on the first year per diem cost to Medicaid, it is noteworthy that Pittman testified that she considered the Division of Medicaid’s projections more accurate. Accordingly, we find no merit to HTC’s contention that the Department’s awarding a score of one to GCH for the first year per diem cost to Medicaid caused the CON to be erroneously awarded to GCH. While it is true that if the Division of Medicaid figures are used, GCH would not receive a rating of one. That rating would go to Glen Oaks, leaving GCH with a rating of two and HTC with rating of three. As stated, both GCH and HTC would gain a point. Thus, their respective positions would remain the same. Based on the rating done by the Division of Medicaid, we find substantial evidence in the record to support the Department’s decision on this issue. We cannot hold the Department in error for finding that GCH’s per diem rate would not be $250 when the Division of Medicaid itself concluded that the rate would be only $109.55. This issue lacks merit.
 

 2. Construction Costs
 

 ¶ 20. HTC also argues that substantial evidence does not exist to support the Department’s findings as they relate to the construction-cost figures submitted by GCH. The comparative analysis reflects that GCH received the lowest score for size, capital expenditure, cost per square foot, and cost per bed.
 
 [5]
 
 It listed its capital expenditure at $369,000 for the construction of a sixty-bed facility that would encompass 25,307 square feet. The Department accepted these projections. HTC listed its capital expenditure at $700,000 for the construction of a sixty-bed facility that would encompass 17,850 square feet. The Department also accepted these projections. Glen Oaks listed its capital expenditures at $786,162 for construction of a
 
 *701
 
 sixty-bed facility encompassing 15,038 square feet.
 

 ¶ 21. The crux of HTC’s argument is that it is literally impossible for GCH to build such a large facility for the small amount of capital expenditure and that GCH did not follow the requirements of the CON manual in computing its costs per square foot. HTC argues that the Department simply took GCH’s figures and made no independent analysis or attempt to determine the reasonableness of them.
 

 ¶ 22. The record reveals that only 7,487 square feet of the 25,307 square feet facility that GCH proposes to construct will be new construction. The remaining square feet will come from utilizing existing patient rooms and common areas in the existing hospital. HTC contends that GCH’s application contains little if any money for the conversion of the existing rooms and spaces for use by the nursing facility. The staff analysis for GCH indicates $319,000 in construction costs, $2,500 in capital improvements, $15,000 in non-fixed equipment, $2,500 for site preparation, $20,000 for fees (architectural, consultant, etc.), $10,000 for contingency reserve, for a total capital expenditure of $369,000.
 

 ¶ 23. During the review hearing, GCH explained that it was able to accomplish so much with so little money because it would use its existing maintenance crew to do much of the work. It further explained that there was very little that needed to be done to convert the existing patient rooms into use by the nursing facility because of when and the way the rooms were built. For example, GCH explained that the existing heating and air conditioning units would not have to be changed out. It further explained that a sprinkler system was already in place and would be utilized.
 

 ¶ 24. Since the bulk of GCH’s capital expenditure would be spent for building 7,487 square feet of space, HTC strenuously argues that GCH should have been required to use only the 7,487 square feet of new construction in calculating its cost per square foot. Pittman explained that it was appropriate under the Department’s guidelines to give GCH credit for the existing space that it would be utilizing as a part of its nursing facility, as it was the Department’s policy to encourage the use of existing facilities whenever possible. Therefore, the total amount of square footage that would be available should be taken into consideration in calculating the cost per square foot. It necessarily follows that since GCH would produce a 25,307 square foot facility for much less than it would cost HTC to construct a 17,850 square foot facility, the end result would be that GCH would attain a lower cost per square foot and cost per bed than HTC. Given Pittman’s testimony and Gardner’s testimony regarding how GCH could accomplish the task of producing the most square feet of space for the least amount of capital outlay, we cannot find that the Department lacked substantial evidence to award GCH the lowest points for size, capital expenditure, cost per square foot, and cost per bed. This issue is without merit.
 

 ¶ 25. We find substantial evidence to support the Department’s finding that GCH received the lowest composite score on the factors that were utilized to assist in the determination of which applicant was the most appropriate applicant for providing the proposed health-care facility or service. Therefore, we affirm the judgment of the Chancery Court of Hinds County, affirming the decision of the Department to award the certificate of need to GCH.
 

 ¶ 26. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS
 
 *702
 
 OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. CARLTON, J., NOT PARTICIPATING.
 

 [1]
 

 . The chancery court determined that the personnel-costs figure would affect the first year cost to Medicaid.
 

 [2]
 

 . The version of 42 C.F.R. § 447.272(a)(l-3) that HTC contends was in effect when the CON was granted reads as follows: (a) "[t]his section applies to rates set by the agency to pay for inpatient services furnished by hospitals, NFs, and ICFs/MR within one of the following categories:” (1) "[s]tate government-owned or operated facilities (that is, all facilities that are either owned or operated by the [s]late),” (2) "[n]on-state government-owned or operated facilities (that is, all government facilities that are neither owned nor operated by the [s]tate),” and (3) "[plrivately-owned and operated facilities.” According to the undisputed testimony at the review hearing, neither HTC nor Glen Oaks would qualify for the additional payments.
 

 [3]
 

 . Even if we were to assume that the UPL that HTC references was in effect when GCH submitted its application, the record does not support HTC’s contention that there is substantial and unrefuted evidence that GCH's first year per diem cost to Medicaid would be $250. While Ted Cain, owner of HTC, placed the figure at that amount, and Paul Gardner, administrator and CEO of GCH seemed to accept Cain's assertion, no evidence was presented to the Department during the review hearing to back up the $250 figure.
 

 [4]
 

 . In performing its analyses, the Department’s Division of Health Planning and Resource Development utilized the figures stated by the applicants in their applications.
 

 [5]
 

 . The cost per bed is directly impacted by the capital expenditure because the cost per bed is derived by dividing the number of beds by the capital expenditure.