603 So.2d 848 (1992)
HTI HEALTH SERVICES OF MISSISSIPPI, INC. d/b/a Vicksburg Medical Center
v.
MISSISSIPPI STATE DEPARTMENT OF HEALTH and Parkview Medical Associates, L.P., d/b/a Parkview Regional Medical Center.
No. 91-CC-0087.
Supreme Court of Mississippi.
June 10, 1992.
*849 Dorian E. Turner, Edmund L. Brunini, Jr., Brunini Grantham Grower & Hewes, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Stephanie L. Ganucheau, Sp. Asst. Atty. Gen., Barry K. Cockrell, Richard G. Cowart, Watkins Ludlam & Stennis, Jackson, for appellees.
En Banc.
DAN M. LEE, Presiding Justice, for the Court:
HTI Health Services of Mississippi, Inc. d/b/a Vicksburg Medical Center appeals from a decree of the Chancery Court of Warren County, Mississippi, affirming an order of the Mississippi State Department of Health (MSDH) denying the application of Vicksburg Medical Center for a certificate of need to establish adult cardiac catheterization services at Vicksburg Medical Center. MSDH denied the certificate of need application on the grounds that Vicksburg Medical Center did not comply with the 1986 State Health Plan, or, more specifically, because it did not meet the minimum population base requirement.
On appeal, we are presented with three claims which, collectively, challenge MSDH's finding that Vicksburg Medical Center failed to satisfy the minimum population base requirement of the 1986 State Health Plan. After careful review of the record and applicable law, we affirm.

I.
On October 15, 1987, Vicksburg Medical Center submitted its notice of intent to file for a certificate of need application with the Mississippi State Department of Health to establish cardiac catheterization services at Vicksburg Medical Center. On December 1, 1987, Vicksburg Medical Center filed its application. The date is significant because the application thus qualified for review *850 in the January-March 1988 review cycle under the 1986 State Health Plan.[1]
Subsequent to the Vicksburg Medical Center filing, Parkview Regional Medical Center[2] filed an application for a certificate of need to establish adult cardiac catheterization services at their hospital facility in the same city. Parkview sought comparative review of the two applications by the MSDH, which was denied, and separately appealed to the Chancery Court. Parkview, as an affected party, opposed Vicksburg Medical Center's application. It moved for, and was granted, permission to intervene as a contestant, and occupies that same status on this appeal.
Following an extensive review and analysis of the application, supporting documents and data, by the staff and personnel of the Planning and Resource Development Division of the MSDH, the staff recommended disapproval of the application to the State Health Officer (SHO). On April 28, 1988, the SHO issued formal disapproval of the Vicksburg Medical Center certificate of need application because Vicksburg Medical Center failed to meet the minimum population base criterion. Vicksburg Medical Center appealed the SHO decision to the Hinds County Chancery Court. The cause was subsequently transferred to the Warren County Chancery Court. See Miss. Code Ann. § 41-7-201(1) (Supp. 1991).
On August 15, 1990, the Warren County Chancery Court issued its opinion that the MSDH decision should be affirmed. On October 31, 1990, final judgment to this effect was entered.
Aggrieved, Vicksburg Medical Center appeals and presents the following issues:
(1) Whether MSDH acted arbitrarily and capriciously in denying Vicksburg Medical Center's application based upon an unprecedented, statistically questionable and inconsistent methodology regarding the calculation of Vicksburg Medical Center's population base?

(2) Whether the finding by MSDH that Vicksburg Medical Center did not meet the minimum required population base for the establishment of cardiac catheterization services is against the substantial weight of the evidence?

(3) Whether the methodology utilized and the subsequent finding by MSDH that Vicksburg Medical Center did not meet the minimum required population base for the certificate of need constitutes an attempt to promulgate rules and regulations outside the statutory procedure and therefore exceeds MSDH's authority?

II.
The 1986 State Health Plan was developed by the Statewide Health Coordinating Council (SHCC) after a lengthy public process. SHCC was authorized to develop and promulgate the State Health Plan, and the MSDH was authorized to administer and carry out the mandates of the State Health Plan. This 1986 Plan served as the point of reference at the time of Vicksburg Medical Center's application.
At the time of Vicksburg Medical Center's application, the State Health Plan provided, inter alia:
A population base of approximately 200,000 to 300,000 shall be required before such services may be approved and the facility proposing the service must prove that they have the referral network to ensure the caseload required. (May be interstate.)
In Dept. of Health v. S.W. Miss. Med. Ctr., 580 So.2d 1238, 1241-42 (Miss. 1991), this Court recognized the population base as a valid, independent criterion which must be met. Elsewhere, the law commands obedience at the administrative level *851 to this and other relevant provisions of the State Health Plan by rendering the State Health Officer personally liable for any additional costs to the State resulting from the issuance of the certificate of need which does not substantially comply with the Plan. Miss. Code Ann. § 41-7-193(1) (Supp. 1991); Grant Center Hospital of Mississippi, Inc. v. Health Group of Jackson, Mississippi, Inc., 528 So.2d 804, 808-10 (Miss. 1988).

III.
In reviewing decisions originating from administrative agencies, we encounter significant limits. The legislature has declared that a certificate of need decision may be subject to judicial review, but:
[S]hall not be vacated or set aside, either in whole or in part, except for errors of law, unless the court finds that the order of the State Department of Health is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the State Department of Health, or violates any vested constitutional rights of any party involved in the appeal.
Miss. Code Ann. § 41-7-201(4) (Supp. 1991).
This statute simply re-states often quoted limitations upon the scope of judicial review of administrative agency decisions which are generally to the effect that such decision should be affirmed unless arbitrary or capricious. Dept. of Health v. S.W. Miss. Med. Ctr., 580 So.2d at 1239; Magnolia Hospital v. Mississippi State Department of Health, 559 So.2d 1042, 1044 (Miss. 1990); Melody Manor Convalescent Center v. Mississippi State Department of Health, 546 So.2d 972, 974 (Miss. 1989); Grant Center Hospital of Mississippi, Inc. v. Health Group of Jackson, Mississippi, Inc., 528 So.2d at 808.
In S.W. Miss. Med. Ctr., 580 So.2d at 1239, we stated:
The terms "arbitrary" and "capricious" are open-textured and not susceptible of precise definition or mechanical application. We find helpful meanings North Carolina has assigned in a not-dissimilar context:
"Arbitrary" means fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment, but depending upon the will alone,  absolute in power, tyrannical, despotic, non-rational,  implying either a lack of understanding of or a disregard for the fundamental nature of things.
"Capricious" means freakish, fickle, or arbitrary. An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles... ."
* * * * * *
The Chancery Court was constrained by these familiar principles. On further appeal, we perform our function under a like regimen.

IV.
Vicksburg Medical Center's argument on appeal focuses on the methodology utilized by the MSDH in calculating Vicksburg Medical Center's population base, and contends the Department's action was arbitrary and capricious. In the present case, department staff looked at patient origin data supplied by Vicksburg Medical Center for the years 1985 and 1986 to determine Vicksburg Medical Center's service area. Licensed facilities such as Vicksburg Medical Center are required by law to submit patient origin data to the Department of Licensure and Certification of the State Health Department. Essentially, the licensed facility collects data reflecting patient admissions and patient origin for a two-week period each October, and every licensed facility is required to collect and submit this information for the same two-week period each year.
By examining this data, the MSDH is able to determine which counties are served by the facility, and, more specifically, what percentage of patient admissions are attributable to which counties. A determination *852 is then made as to which counties will be included by the MSDH within the facility's service area. A licensed facility must draw a certain percentage of its admissions from a particular county in order for that county to be included in the service area. The best we can tell, the MSDH does not rely on any bright line criteria, but instead will exclude those counties from which the licensed facility can show only de minimis admissions. We noted in S.W. Miss. Med. Ctr. that the use of historical patient origin data from a two-week sample period is not an arbitrary method to use in determining service area and, ultimately, population base. 580 So.2d at 1240-41.
Once the service area is defined, the MSDH then determines the population base for the proposed service. This figure represents the actual number of people within the service area which the applicant facility may reasonably expect to serve. In those counties within the service area where no competing providers are present and offering the same service, the entire population is counted. Put otherwise, if a specific service, such as adult cardiac catheterization, is not provided in a county, the population base for a proposed adult catheterization service is the entire county.
Where, on the other hand, a county or counties within the service area of the applicant also happen to fall within the service area of another competing provider, the MSDH uses a market share analysis to apportion to the applicant facility a share of the affected population. Common sense suggests that when the service areas of two or more providers overlap, the analysis of need by the staff should be based upon the proportion of population to be served by the facility proposing the additional service. In such a case, the population base is that proportion of the population reasonably expected to be served by the facility proposing the new service. Importantly, service area and population base for the service, are not always synonymous.

A.
In this case, the patient origin data showed that 85% of Vicksburg Medical Center's patients came from Warren, Claiborne, Sharkey, and Hinds Counties, and that 11% of Vicksburg Medical Center's patients came from certain Louisiana parishes. From this service area, the MSDH proceeded to determine Vicksburg Medical Center's population base for the proposed catheterization service.
MSDH allowed the entire population of the Louisiana parishes claimed by Vicksburg Medical Center to be included in Vicksburg Medical Center's population base. With the exception of Hinds County, 100% of the population of the other three Mississippi counties was allotted to Vicksburg Medical Center. But, because there were other providers of the proposed service in Hinds County, the Hinds County population was further analyzed, or market shared, in order to allot Vicksburg Medical Center its individual market share of the population of Hinds County. In the end, MSDH determined that Vicksburg Medical Center's population base for the proposed service was 167,689, well below the required 200,000 minimum.

B.
Vicksburg Medical Center, on the other hand, claimed a population base of 203,507, which in turn was based on a slightly different service area than that found by the MSDH. Vicksburg Medical Center specifically objects to the Department's refusal to include Issaquena, Jefferson and Yazoo Counties in its service area, and ultimately, in its population base. These counties were not included because Vicksburg Medical Center's individual, historical patient origin data showed insufficient patient admissions from these counties to merit their inclusion in Vicksburg Medical Center's service area.
Using logic we find elusive and unpersuasive, Vicksburg Medical Center suggests the counties of Issaquena, Jefferson and Yazoo should have been included in its service area because "[p]atients from these counties utilize Warren County facilities ... [although] Vicksburg Medical Center's individual patient origin reports do not *853 show patients from these counties." Vicksburg Medical Center appears shocked that the "MSDH thus defined Vicksburg Medical Center's population base on the basis of Vicksburg Medical Center's individual patient origin statistics, rather than that of the service area's patient origin statistics." (emphasis in original).
The pivotal inquiry is whether Vicksburg Medical Center has the requisite population base to sustain its proposed adult cardiac catheterization service. Vicksburg Medical Center's own patient origin data is the obviously relevant and reliable indicator of this fact. We can't fault the MSDH for refusing to give Vicksburg Medical Center credit for patient admissions to facilities in Warren County other than Vicksburg Medical Center, especially when, as here, another Warren County facility has itself applied for a certificate of need to establish adult cardiac catheterization service.

C.
Vicksburg Medical Center also argues that the so-called market share methodology utilized by MSDH constitutes an attempt to promulgate rules and regulations outside the statutory procedure and exceeds MSDH's authority. We do not think so. The 1986 State Health Plan does not define the term "population base," and is silent with regard to the statistical or other methodologies which MSDH may employ to determine whether there has been substantial compliance with the requirements of the Plan.[3]
In S.W. Miss. Med. Ctr., the Court noted that, by statute, MSDH may "objectively review" any "statistical data and information" tendered to it for consideration. "The Department's power [in establishing criteria and reviewing certificate of need applications] is limited only in that it may not be arbitrary or capricious." 580 So.2d at 1240.
Nothing suggests MSDH's use of market share methodology in reviewing certificate of need applications is somehow arbitrary or capricious. Market sharing, as a statistical tool, allows MSDH to go beyond the assertions of an applicant and accurately determine what part of the patient pie may logically be claimed by an applicant proposing a service in an area already being served by existing providers.
Market sharing is not a standard, rule or regulation. Rather, it is a methodology, or statistical yardstick, used by MSDH to calculate or measure the population base in areas where there are multiple providers of the same service. Put another way, market sharing is only a tool used to measure and determine whether particular standards and criteria contained within the four corners of the State Health Plan have been satisfied. The State Health Plan identifies standards and criteria which must be met, but even Vicksburg Medical Center concedes that the State Health Plan does not identify specific methods which must be used to determine if the requirements of the Plan have been met.
The methodology used to determine or measure population base in any given case should not be carved in granite; instead, some flexibility is required. It is prudent to utilize a methodology that will accommodate the various and sundry circumstances found in each individual case. The objective of it all, in the final analysis, is to determine need. "Our state's health regulators have been empowered to deny certificates of need absent evidence the services the applicant proposes are needed and will be provided with high quality control and on a cost-effective basis." S.W. Miss. Med. Ctr., 580 So.2d at 1241.
Vicksburg Medical Center concedes rather frankly that it cannot prove the methodology used by MSDH is mathematically or statistically inferior. Instead, Vicksburg Medical Center claims that it was caught off guard by the use of market share methodology, or that MSDH had not previously used this methodology, thus making MSDH's action all the more arbitrary. For obvious reasons, Vicksburg Medical Center *854 would rather MSDH accept its application at face value. While these claims reflect Vicksburg Medical Center's belief that all the time and money it spent on this application should not go unrewarded, they are insufficient to advance the ball on appeal.

V.
In sum, we hold the use of market share analysis to determine population base is not arbitrary or capricious. Vicksburg Medical Center's application was properly denied because it failed to meet the minimum 200,000 population base criterion. We can't say that decision turned on unpublished, unpromulgated standards or criteria. Nor can we say that MSDH acted arbitrarily or capriciously, or outside its authority, or violated any vested constitutional rights. The record further shows that the decision of MSDH is supported by substantial evidence.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
PRATHER, J., not participating.
NOTES
[1] Effective July 1, 1991, the 1991 State Health Plan became operative.
[2] Parkview Regional Medical Center was formerly Mercy Regional Medical Center. Mercy was acquired by Parkview Medical Associates, L.P., a Mississippi limited partnership, effective November 1, 1990.
[3] The 1991 State Health Plan is more specific, and states that the MSDH may use a variety of statistical methodologies, including market share analysis, to determine whether the requirements of the Plan have been met. 1991 State Health Plan pp. I-2, IX-59.