# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-01957-SCT

*ATTALA COUNTY BOARD OF SUPERVISORS d/b/a*
*ATTALA CARE CENTER*

*v.*

*MISSISSIPPI STATE DEPARTMENT OF HEALTH*
*AND GARRY V. HUGHES d/b/a THE KENNINGTON*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/21/2002 |
| TRIAL JUDGE: | HON. JOHN C. LOVE, JR. |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JULIE ANN BOWMAN |
| | ANDY LOWRY |
| | THOMAS L. KIRKLAND, JR. |
| ATTORNEYS FOR APPELLEES: | ROBERT RICHARD CIRILLI, JR. |
| | EDMUND L. BRUNINI, JR. |
| | SARAH E. BERRY |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 02/26/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE PITTMAN, C.J., EASLEY AND DICKINSON, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

## PROCEDURAL HISTORY

¶1.     On June 27, 2002, the Mississippi State Department of Health (MSDH) awarded a certificate of need (CON) to Garry V. Hughes (Hughes), d/b/a the Kennington for the construction of a 60-bed nursing home in Attala County, Mississippi.  There were four applicants:  (1) Hughes d/b/a the Kennington; (2) the Attala County Board of Supervisors (the Board) d/b/a Attala Care Center; (3) Attala Health Care Center, Inc.; and (4) Sentry North, L.P. (Sentry) d/b/a Sentry Attala.  The Board was the only applicant to timely

appeal the MSDH's decision to the Chancery Court of Attala County pursuant to Miss. Code Ann. § 41-7-201(2) (Rev. 2001). The chancery court issued its decision affirming the CON award to Hughes and denied the Board's motion for reconsideration.[1] The Board now appeals to this Court.

**FACTS**

¶2. The Mississippi Legislature authorized MSDH to award a CON to build a 60-bed skilled nursing facility (nursing home) in Attala County. On June 1, 2001, the MSDH received four CON applications for the construction of a 60-bed nursing home in Attala County. After finding that all four of the CON applications were complete, the MSDH's CON division entered the applications into the July 2001 review cycle.

¶3. The CON review process follows the steps set forth in the *Certificate of Need Review Manual* (the *Manual*) published by the MSDH. Step one is to file a notice of intent to seek a CON. Step two is to submit the full CON application in accordance with the *Manual*. If an application is found to be incomplete by MSDH, supplemental information may be filed within a month after the initial filing deadline. Step three is for the MSDH staff to analyze those applications which are substantially complete and compliant and to recommend whether they should be approved or rejected. Where there exists competing nursing home applicants for the same CON, as in this case, the staff rates the applicants on a point scale out of ten categories.

---

[1] The hearing officer adopted verbatim Hughes's proposed findings of fact, conclusions of law and recommendation, and two days later, the State Health Officer (SHO) adopted verbatim the hearing officer's report. The chancery court stated in its memorandum opinion and judgment that it was aware that the findings of fact and conclusions of law signed by the hearing officer were adopted verbatim from those prepared by Hughes's counsel. Therefore, the chancery court applied a "heightened scrutiny" and "analyzed such findings with greater care," citing *Brooks v. Brooks*, 652 So.2d 1113, 1118 (Miss. 1995); *OmniBank v. United S. Bank*, 607 So.2d 76, 83 (Miss. 1992); *Greenwood Utils. v. Williams*, 801 So.2d 783, 788 (Miss. Ct. App. 2001).

¶4. The MSDH's CON staff (the Staff) determined that all four applications were in substantial compliance with the applicable policy statements, standards and criteria in the Fiscal Year 1999 *Mississippi State Health Plan* (the *Plan*). After finding substantial compliance with the *Plan*, the Staff applied the comparative scoring methodology for competing applicants contained in the *Manual* to rank the applicants. The *Manual* established factors that the MSDH must consider in cases where there exists competing CON applications. The factors are derived from the *Plan* and designed to promote the policies contained in the *Plan*. These factors were considered by the Staff in ranking the applicants:

| | | | |
|---|---|---|---|
| 1. | Size of facility; | 6. | Medicare Utilization; |
| 2. | Capital Expenditure; | 7. | Total Cost to Medicaid; |
| 3. | Cost Per Square Foot; | 8. | Per Diem Cost to Medicaid; |
| 4. | Cost Per Bed; | 9. | Continuum of Care Services; |
| 5. | Staffing; | 10. | Community Support. |

¶5. According to the *Manual*, each of the factors are assigned equal weight. The application receiving the lowest composite score in the ranking will be considered the most appropriate application. That is, the winner of a factor will receive a score of 1, and the second place applicant will receive a score or 2, and so forth.

¶6. In the case at hand, the comparative scoring methodology conducted by the Staff resulted in composite scores of 16 for Hughes; 17 for Attala Health Care Center; 26 for Sentry; and 34 for the Board. Based on these results, the Staff recommended approval of Hughes's application and disapproval of the other three applications. Following the Staff's recommendation, both the Board and Hughes requested a public hearing during the course of review on the Board's application. Attala County Health Care Center and Sentry did not request a public hearing on any of the four applications. They also did not participate in the hearing between the Board and Hughes.

¶7. The public hearing was held on June 5, 6 and 7, 2002, before an independent hearing officer who was appointed by the Attorney General's Office. Hughes and the Board had legal representatives present throughout the hearing. A total of ten witnesses testified, including Harold Armstrong (Armstrong), Chief of the Division of Health Planning and Resources Development. A total of fifty-five exhibits were identified or admitted into evidence.

¶8. After the hearing, the hearing officer asked the parties to submit proposed findings of fact and conclusions of law by June 21, 2002, to permit a recommendation to the SHO before the June 27, 2002, monthly CON meeting. Due to a delay by the court reporter in preparing the transcript, the parties requested that the hearing officer extend the deadline for submitting proposed findings of fact and conclusions of law to June 24, 2002.

¶9. After considering the parties' written briefs, the hearing officer concluded that the Staff's comparative scoring methodology was sound and was properly applied by the Staff to the four competing applications. The hearing officer recommended to the SHO that the MSDH approve Hughes's CON application for the additional long-term nursing home beds in Attala County. The SHO agreed with the recommendation of the Staff and the hearing officer and awarded Hughes the CON.[2]

¶10. The Board appealed the SHO's decision to the Chancery Court of Attala County. The chancery court issued its memorandum opinion and judgment affirming the MSDH's decision that Hughes presented the most appropriate CON application. While criticizing certain parts of the MSDH comparative scoring methodology, the chancery court concluded there was substantial evidence to support the MSDH decision. The Board's motion for reconsideration was subsequently denied by the chancery court.

---

[2] The hearing officer adopted verbatim Hughes's proposed findings of fact, conclusions of law and recommendation, and two days later, the SHO adopted verbatim the hearing officer's report.

4

## DISCUSSION

¶11. The Court now addresses the following issues raised on appeal by the Board:

**I.** **Whether the chancery court erred in its fundamental approach to the appellate review of Hughes's CON application.**

**II.** **Whether the MSDH's methodology used for its comparative review of competing CON applications was arbitrary and capricious.**

**III.** **Whether the entire selection process was hopelessly tainted by the publicly posted data on the MSDH's website so as to render the MSDH's subsequent ruling arbitrary and capricious.**

## I. Appellate Review

¶12. Miss. Code Ann. § 41-7-201(2)(f) specifies the extent of judicial review when an appeal is taken from a final order of the MSDH. Miss. Code Ann. § 41-7-201(2)(f) provides that a SHO's CON order can be subject to judicial review. However, the "Court's standard of review... is quite limited." *St. Dominic-Jackson Mem'l Hosp. v. Miss. State Dep't of Health*, 728 So.2d 81, 83 (Miss. 1998). Miss. Code Ann. § 41-7-201(2)(f) provides in part:

> The order shall not be vacated or set aside, either in whole or in part, except for errors of law, unless the Court finds that the order of the State Department of Health is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the State Department of Health, or violates any vested constitutional rights of any party involved in the appeal....

¶13. The decision rendered by the hearing officer and the SHO is "afforded great deference upon judicial review by the court, even though we review the decision of the chancellor." *St. Dominic-Jackson*, 728 So.2d at 83 (citing *Miss. State Dep't of Health v. Southwest Miss. Reg'l Med. Ctr.*, 580 So.2d 1238, 1240 (Miss. 1991)).

¶14. There is a rebuttable presumption in favor of the decision rendered by an agency. *His Way Homes, Inc. v. Miss. Gaming Com'n*, 733 So.2d 764, 767 (Miss. 1999) (citing *Sprouse v. Miss.*

*Employment Sec. Comm'n*, 639 So.2d 901, 902 (Miss. 1994)); *Miss. Comm'n on Envtl. Quality v. Chickasaw County Bd. of Supervisors*, 621 So.2d 1211, 1216 (Miss. 1993). "[T]he burden of proving to the contrary is on the challenging party." *Id*. This Court, as well as, chancery and circuit courts, cannot "substitute its judgment for that of the agency or reweigh the facts of the case." *Id*.

¶15.    Our constitution does not allow for the courts to conduct a de novo retrial of matters on appeal from administrative agencies. *Cook v. Mardi Gras Casino Corp.*, 697 So.2d 378, 380 (Miss. 1997). The judiciary is not permitted to make administrative decisions. *Id*. Therefore, this Court has recognized the strict limitation set out in Miss. Code Ann. § 41-7-201(2)(f) for appellate review in our courts as to decisions of the SHO and the MSDH.

¶16.    In *Miss. Dep't of Health v. Natchez Cmty. Hosp.*, 743 So.2d 973, 977 (Miss. 1999), this Court stated: "It is within the power of the chancellor to reverse the decision to grant the CON if such decision was not supported by substantial evidence. Substantial evidence means more than a scintilla or a suspicion."

¶17.    To prevail on appeal, the appellant must demonstrate that an administrative agency's decision was arbitrary and capricious and not based on substantial evidence. *See id*. *See also Cain v. Miss. State Dep't of Health*, 666 So.2d 506, 510 (Miss. 1995); *Delta Med. Ctr. v. Greenwood Leflore Hosp.*, 609 So.2d 1276, 1277 (Miss. 1992). This Court in *Miss. State Dep't of Health v. S.W. Miss. Med. Ctr.*, 580 So.2d at 1239, stated that "[t]he terms 'arbitrary' and 'capricious' are open-textured and not susceptible of precise definition or mechanical application." *See HTI Health Servs. of Miss., Inc. v. Miss. State Dep't of Health*, 603 So.2d 848, 851 (Miss. 1992).

¶18.    This Court has adopted helpful definitions that North Carolina had assigned in a similar context:

> "Arbitrary" means fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment, but depending upon the will alone, – absolute in power, tyrannical, despotic, non-rational, – implying either a lack of understanding of or a disregard for the fundamental nature of things.
>
> "Capricious" means freakish, fickle, or arbitrary. An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles...."

*HTI Health Servs.*, 603 So.2d at 851 (quoting *S.W. Miss. Med. Ctr.*, 580 So.2d at 1239).

¶19. This Court must now determine whether the MSDH's decision was arbitrary and capricious, or unsupported by substantial evidence.

## II. MSDH's Methodology

¶20. The Board's argument on appeal focuses on the methodology utilized by the MSDH in its comparative review of the competing CON applications, and it contends the MSDH's action was arbitrary and capricious.

¶21. This Court has stated:

> The methodology used in any given case should not be carved in granite; instead, some flexibility is required. It is prudent to utilize a methodology that will accommodate the various and sundry circumstances found in each individual case.

*HTI Health Servs.*, 603 So.2d at 853.

¶22. This Court defined both arbitrary and capricious in the context of administrative agencies in *Natchez Cmty. Hosp.*, 743 So.2d at 977. An administrative agency's decision is deemed to be arbitrary "when it is not done according to reason and judgment, but depending on will alone." *Id*. (citing *Burks v. Amite County Sch. Dist.*, 708 So.2d 1366, 1370 (Miss. 1998)). A action is defined as being capricious when "done without reason, in a whimsical manner." *Id*.

¶23. Under MSDH's ten-factor comparative scoring methodology, Hughes finished in first place with a composite score of 16. The Board finished in last place with a composite score of 34.[3] On appeal, the Board contests Hughes's projection and statements as to the following: (1) square footage; (2) capital expenditure; (3) cost per square foot; (4) staffing; (5) medicare utilization; and (6) certification.

## 1. Square footage

¶24. The Board contends that because the hearing officer found that Hughes's 15,919 square footage projection was understated, his application was substantially incomplete or noncompliant with the criteria in the *Plan* and the *Manual*. Johnny Wynne (Wynne), Hughes's architect, testified that in calculating the square footage, the non-heated areas were inadvertently left out of the calculations. Wynne prepared the preliminary schematic drawings on his computer but failed to take in to account the non-heated areas. The 479 square-foot understatement represented approximately 3% of the total project. The hearing officer determined that "if there are any modifications to the Kennington [Hughes] floor plan, these modifications will be only minor and will not result in an appreciable difference from the 15,919 square feet proposed in the Kennington's application."

¶25. Dale Carr of the MSDH's Licensure Division testified at the CON hearing that it makes absolutely no sense that anyone would prepare full scale, full blown architectural plans and drawings prior to receiving a CON. Typically, a basic plan is a projection.

¶26. Wynne rebutted the testimony by the Board's architectural expert witness, Brett Gasaway (Gasaway), that Hughes's nursing home plan for a 15,919 square foot facility did not comply with the licensing regulations. Wynne testified that he had been employed as an architect since 1963, with vast

---

[3] Attala Health Care finished in second place and Sentry finished in third place. However, these two did not appeal.

experience in the construction of nursing homes. In 1983, Wynne started his own business. Wynne estimated that since 1983, he builds 3 to 4 nursing homes a year. Prior to that while employed with Mediplex, an architectural company which builds nursing homes, he built 47 nursing homes. Based on his vast experience, Wynne was confident the 15,919 square foot facility would comply with the licensure regulations. Wynne noted that the areas for the clean linen storage and laundry that Gasaway claimed was missing was located "at the center court" on the design.

¶27.   The Board also raised questions about whether Hughes could provide adult day care, social and recreational activities, therapy and barber and beauty shop services in a 15,919 square foot facility.

¶28.   Armstrong testified that an adult day care center program is not required as part of a skilled nursing facility. Carr also testified that Mississippi does not license in a category called adult day care. Hughes stated that unoccupied rooms could be used for adult day care for the first year with future expansion to accommodate such a program. According to Armstrong, while it may be listed in an application, there is no requirement that it be done. No points are provided for having adult day care.

¶29.   Larry Fortenberry (Fortenberry) is the owner of Southern Health Care, the company designated to manage and operate the Kennington. Fortenberry testified that he has been a licensed nursing home administrator for approximately 30 years, managing 3 nursing homes, including Hughes's nursing home, Willow Creek, located in Byram, Mississippi. Fortenberry is a member of the Independent Nursing Home Association. Based on his experience, Fortenberry testified that while there is no requirement that a therapy room be provided, "you do have to meet the needs of the residents and provide therapy as we do in our facilities. Our therapy is done in the [resident's] room which provides a little more dignity and privacy to the residents which is a big issue in patient rights and that's where they want most of their therapy

9

provided." Fortenberry noted that the semi-private rooms would be equipped with curtains which can be drawn and doors that would close in order to provide privacy for the therapy.

¶30. The Board argues that Hughes's plan does not contain a separate activity or recreation room. Wynne testified that Hughes planned to have a folding curtain in the dining room to be able to hold assemblies. Wynne observed that his design as opposed to small separate rooms would better accommodate the trend of residents wanting to have space for an assembly of all the people at Christmas or family gatherings. According to Wynne, the building would accommodate all of the requirements.

¶31. The Board also argues that Hughes's floor plan does not account for barber/beauty shop services. However, Carr testified that a barber/beauty shop is not required under the licensing regulations. Therefore, it does not count against the applicant. Wynne testified that while the service is not required, the building plan is large enough to accommodate the service. Wynne noted that the barber/beauty shop service is not offered on an eight hour per day basis but on a contract basis.

¶32. The chancery court did not find that the MSDH erred in considering Hughes's bid. The chancery court stated:

> It is true that Mr. Hughes's bid was not complete when originally submitted and that in the hearing process, the hearing officer, apparently, treated it as modified in some areas, but there was substantial evidence to support part of his proposal. The system used by the Department [MSDH] permits amendments to the proposal, and the system permits adjustments to be made in the hearing process when deficiencies or errors are discovered.

¶33. This Court finds that the chancery court did not err in finding substantial evidence to support the decision of the hearing officer and the SHO. The MSDH's decision was not arbitrarily or capriciously made as to Hughes's ranking in this category.

### 2. Capital Expenditure/Cost per Square Foot

10

¶34.    The Board contends that Hughes cannot build the Kennington for $39.16 per square foot. Hughes has been a contractor and developer since 1963. Hughes stated that he can be cost efficient when building because of his years of experience. The Board argues that its expert, Gasaway, testified that Hughes's figure is contrary to the R/S Means data which sets the minimum cost per square foot at $66.00 for a compared projection in the South.

¶35.    Hughes testified that he built his nursing home, Willow Creek, in Byram, Mississippi, for the actual cost $41.33 per square foot. Hughes noted that the cost of Willow Creek was higher than the Kennington because Willow Creek's exterior was brick rather than vinyl siding, the rooms were larger, the commercial area was larger and the bathrooms, kitchen areas and commercial areas all contained concrete blocks. Hughes also identified other areas that would save money on the project by doing their own work rather than subcontracting: finish carpentry, roofing, drywall, earth work and landscaping. Hughes said that these savings, as well as, the variance in construction fees in different parts of the State are not taken into account in the R/S Means data.

¶36.    The hearing officer stated:

> On cross-examination, however, Mr. Gasaway admitted that the R/S Means Index is only a reference guide and that it has no legal effect. (Gasaway 156). He further testified he had no personal knowledge of Willow Creek and Mr. Hughes's ability to construct that facility for $41.13 per square foot. (Gasaway 162, 169). He could not identify anything wrong with the Willow Creek construction. (Gasaway 162).
> Mr. Hughes adequately explained why his projected cost of $39.16 is less than the figures shown in the R/S Means Index. Because he is the owner and contractor, Mr. Hughes will not be paying himself a profit. (Hughes 154). According to Mr. Hughes, on this particular project, the contractor's profit would be approximately $71,000. (Hughes 155). He also explained he would be only operating at about 4% overhead, which would result in another $28,000 in savings. (Hughes 155). Because he will be on the job every day, he will not have to pay a superintendent's salary. (Hughes 156). This salary would be about $32,000. (Hughes 156). He estimates saving $20,000 on the concrete work because he has his own equipment for the job and therefore will not be required to hire a subcontractor. (Hughes 156). He projects a savings of $15,000 on the rough carpentry.

(Hughes 156). For finish carpentry, Mr. Hughes stated that he would hang his own doors, do his own base and run his own handrails. (Hughes 157). This would result in a savings of approximately $10,800. (Hughes 157). He also projects savings on roofing and drywall due to the fact he will not have to hire subcontractors for this work. (Hughes 157).

In all, Mr. Hughes projects he will save about $206,000 on the Kennington construction as a result of having his own equipment and manpower. (Hughes 157). If this figure is added to the $623,388 figure, the total would be $829,388. At 15,919 square fee, the cost per square foot would be approximately $52.10 per square foot, a figure that is in line with the data supplied by the R/S Means Index.

With respect to the numbers submitted for the Kennington's new construction, this Hearing Officer finds that Mr. Hughes's testimony is more reliable and a more accurate indicator of what the Kennington's actual cost will be. It is undisputed that he has already built a nursing home in Byram, Mississippi, and that he used the numbers from this construction as a reference guild for projecting his costs to build the Kennington. While the R/S Means Index may as a useful resource for builders, the Willow Creek numbers shown in Exhibit 30 and the backup documentation for those numbers provide a much more reliable source for projecting the Kennington's new construction costs. Moreover, even if the Kennington is required to modify its preliminary plans to provide, for example, 16,500 square feet as opposed to the 15,919 it has projected, such an adjustment would not have the type of impact on new construction costs that would result in the Kennington not receiving one point for the capital expenditure factor.

¶37. The Board also argues that Hughes's capital expenditure figures are inaccurate because the facility will actually be larger than the 15,919 square feet projected in the application. As previously discussed, the facility's projected square footage failed to include 500 additional square feet of non-heated space. Hughes testified that 500 square feet of non-heated space would only be a minor adjustment in the total capital expenditure. Hughes further stated that the application contained $30,000 in contingency costs that probably would cover any additional space.

¶38. Hughes offered competing testimony to that provided by the Board's expert, Gasaway. The hearing officer heard the testimony of both Hughes and Gasaway, and he determined that substantial evidence existed to support Hughes's position. In *Cain*, 767 So.2d at 213, this Court stated: "A review of the testimony and evidence in the record supports the conclusion that the present case is largely one of

competing testimony, and it is apparent the Health Officer is in a better position than this Court to evaluate this evidence."

¶39.	As to the capital expenditure issue raised by the Board, the chancery court did not find that the MSDH's decision should be altered as to Hughes's ranking in this category. The chancery court stated:

> [The Board] challenges Kennington's [Hughes's] figures. The evidence reveals that [t]he Kennington had erroneously stated its total square footage and that its facility would, clearly, have to be larger that the 15,919 square feet its application indicates. There was also evidence that its site preparation costs would be more than indicated in its application. However, if its capital expenditures went up 25%, it would still be over 25% lower than Attala's [the Board's]. Since it is, apparently, the Department's policy to allow modifications in applications, the Court finds that even with a 25% increase in this category, it would not change the rankings assigned, for its costs would still be way below Attala Care Center [the Board] and Attala Healthcare.
> The next item is costs per square foot, and though its costs will go up if its square footage goes up, this should not affect its costs per square foot much since there would be a larger square footage to spread the costs over. In addition, Attala Care Center's [the Board's] costs per square foot is about 30% more than [t]he Kennington's, so the change should not affect the ranking in this category. The Court recognizes that there is not a great deal of difference between [t]he Kennington figure and the Attala Healthcare figure in this category, but from the data available, the Court cannot find that any change in square foot costs would move Kennington from a one ranking to a two in this category.
> With extreme difference in costs per bed between Kennington and Attala Care Center [the Board] and Attala Healthcare, even a 25% increase in costs in order to give Kennington the required square footage should not change the ratings in this category either.

¶40.	We find that there is no evidence to support the Board's position that the MSDH's decision was either arbitrary or capricious. Substantial evidence was presented by Hughes as to his plans for the Kennington. The chancery court did not err in finding that Hughes's ranking for this category should not be altered.

### 3.	Staffing

¶41.	Hughes's application projected that 77 full-time employees would be hired at the Kennington during its first year. Hughes testified that he relied on Ann Davis (Davis) and Fortenberry for the operational

numbers for the facility in the application. Davis, formerly of the Independent Nursing Association, was recommended to assist in preparation of the CON application. She in turn recommended Fortenberry to manage the Kennington. Davis, who had been sick, subsequently died before the hearing took place. Hughes testified that before she got sick, Davis was instrumental in putting the operational numbers together.

¶42. Fortenberry testified that he provided the numbers to Davis for the number of employees that would be needed. He testified that at that time he was not aware that the CON application required full-time employees to be based on a 40-hour week. Fortenberry based his number on his staffing schedule that he used in his other facilities. He classified some employees as a full-time employee with a 32-hour week.

¶43. After MSDH scored the CON applications, Hughes discovered the 40 hours per week requirement. At the hearing, Hughes adjusted his projection for full-time employees. Fortenberry never informed Davis that some of the employees were figured at a 32-hour week. Fortenberry testified that Davis asked him to submit numbers based on what he does, but she did not tell him it had to be on a 40 hour per week basis.

¶44. Darryl Bueker (Bueker), a CPA who specializes in nursing home financial matters, testified as the Board's expert that in his opinion the Kennington's actual full-time employees would be 37.1 on a 40-hour per week basis. However, Tom Barnett (Barnett), Hughes's CPA, disputed Bueker's figure. Barnett testified it was impossible to operate a 24 hour a day, 7 days a weeks nursing home like the Kennington with 37.1 full-time employees. According to Barnett, after converting all full-time employees to a 40-hour per week basis, 66 full-time employees would be needed.

¶45. The hearing officer stated in his findings and conclusions:

Mr. Bueker's calculation fails to take into account that 23 employees submitted as part of the Kennington's 77 FTE [full-time employees]. Projection were on a 40-hour week.... Mr. Barnett's calculations.... are consistent with Mr. Fortenberry's testimony that he will hire employees on an as-needed basis or "ramping" during the first year... Mr. Barnett's calculations are based on actual data and factual information, as opposed to flawed assumptions. As a result, a projection of 66 FTEs is substantially more accurate than 37.1. On this basis, the Kennington would not lose any points on the conversion, nor would any of the other applicants' positions change.

¶46.    The chancery court also did not accept Bueker's calculation on behalf of the Board and stated:

[T]he [C]ourt recognizes that the witness for Attala [the Board] testified that [t]he Kennington FTE number should be thirty-seven, but the Court does not understand how he [Bueker] arrived at that. The Court finds that when you convert a thirty-two hour week to a forty-hour week, you reduce the required number by 20%.

¶47.    Since Hughes did not make clear in his application which full-time employees were calculated at a 32-hour week, the chancery court required that all of Hughes's full-time personnel be converted to a 40-hour week. The chancery court found that: "[W]ith the leniency shown by the Department in permitting adjustments to the application, the Court concludes that the adjustment is in accord with the Department's procedure." The chancery court stated that with the adjustment the Kennington would moved to be ranked number 2, but the adjustment resulted in "no change in the ranking between Kennington [Hughes] and Attala Care Center [the Board].

¶48.    This Court finds that there is substantial evidence to support the chancery court's decision that the MSDH's decision was not arbitrary and capricious.

### 4.    Medicare Utilization

¶49.    Hughes submitted in his application a projected Medicare utilization percentage of 35%. The State's Medicare utilization rate is 5.3 %. Hughes's projection is over six times the State's rate. The Board argues that it was arbitrary or capricious for the MSDH to accept Hughes's Medicare utilization projection. However, the Board is silent to the fact that it is also over the State's average Medicare utilization rate. The

Board submitted an application that is approximately four times the State's average at a Medicare utilization rate of 20%. In fact, all four applicants submitted a Medicare utilization rate substantially higher than the State's average.

¶50. The hearing officer stated that while Hughes's and the Board's "projections seem high, they finished third and fourth in this category, respectively." That is, Hughes finished in third place, receiving only one more point than the Board in this category. Rather than find that all four applicants were substantially noncompliant and could not be considered by the MSDH, the hearing officer placed all the applicants on an even playing field, awarding each applicant a score of 1 in this category.

¶51. Armstrong testified that it is virtually impossible to accurately project the Medicare utilization rate for a nursing home before it begins operation. According to Armstrong, the MSDH accepts Medicare utilization projections as long as the projections are submitted and sworn to by each applicant.

¶52. The chancery court found that "the same fallacy exists with all of the applications, and it appears that all of the applicants thought the Department would just accept whatever figure they submitted." The chancery court agreed with the hearing officer that all of the applicants should be treated the same.

¶53. The chancery court found that it was improper for the MSDH to accept the unsupported figures submitted by Hughes. Based on the fact that both Hughes and the Board submitted Medicare utilization rates far above the State's average and the fact that both applicants were provided the same score in this category, this Court finds that the chancery court did not err in agreeing with the hearing officer's decision to treat each applicant the same. The alternative to giving each applicant the same score would result in no long-term nursing home being built in Attala County. Since each of the applicants was awarded the same score, we find this issue to be without merit.

### 5.     Certification and Agreement

¶54. The Board contests the fact that Hughes did not certify the supplemental information to the original application that was filed. However, Armstrong's testimony established that the MSDH does not require that supplemental information have additional certification. Hughes's original application contained a certification as required for submission of a CON application.[4] Armstrong testified that "[t]he additional information becomes the application in addition to what was originally filed." Armstrong testified that he had no knowledge of any requirement that a certification be sent with the additional information if the applicant is later required by the MSDH to submit supplemental information.

¶55. The Board also argues that Hughes's application did not contain a signed agreement that he would not transfer ownership of the facility for three years. The MSDH reduced Hughes's score by one point for the agreement even though Hughes's application contained a separate unsigned written agreement not to transfer. The chancery court found that it was whimsical for the MSDH to deduct this point from Hughes's score.

¶56. This Court finds that the chancery court did not err in not allowing the deduction of one point from Hughes's score for failing to sign the agreement. As stated by the chancery court, the minor alterations of the ranking scores had no effect on the overall ranking of the applicants.

### III. Disclosure on MSDH's Website

¶57. The Board argues that Hughes received an unfair advantage because the MSDH disclosed the Board's capital expenditure on its website. The information was disclosed as part of the MSDH weekly

---

[4] The Board contends that Hughes was not the actual applicant to receive the CON. However, this argument is devoid of any merit. Armstrong's testimony clearly stated that Hughes would be the owner of the facility applying for the CON. The record does not reflect this issue was addressed by the chancery court.

17

CON report on June 1, 2001. The Board contends that the MSDH's decision to overlook the disclosure was arbitrary and capricious.

¶58. Hughes testified that he prepared his projected capital expenditure numbers and gave those numbers to Davis to be included in the application sometime around the 23rd, 24th or 25th of May [2001]. Hughes testified that he never altered his capital expenditure numbers from the time he turned them over to Davis. Barnett testified that he did not see any significant discrepancy between the capital expenditure numbers submitted by Hughes and those used by Davis. The Board failed to prove that the numbers were altered.

¶59. In addition to the Board's failure to prove that Hughes actually used the disclosed information to alter his projection, the Board's argument is also contradicted by Armstrong's testimony. When questioned about what kind of study he conducted after learning that the capital expenditure information had been disclosed, Armstrong stated that the rankings of the factors that might have been affected by the disclosure were removed from consideration to see if the end result would have changed. Specifically, Armstrong stated:

> The thought that I had was that, well, we'll do the comparative analysis using all 10 factors and then we'll take out two. We'll exclude the capital expenditure and the cost per bed and see how that affects the rankings of each of the facilities.
> And the conclusion that we reached was that of those people who disclosed their capital expenditure there was no change whatsoever in the rankings regardless of whether you used 10 factors or eight factors.

¶60. In upholding the decision of the hearing officer and the SHO, the chancery court stated:

> The Department seems to acknowledge that revealing details of Attala Care's bid on its internet site before Mr. Hughes submitted his full proposal was improper. The evidence reveals that because of this concern, the Department made a limited reevaluation of the proposals for the Attala County project as well as other counties and gave consideration to two of the factors that might have been affected by the data that was put on the website. Mr. Armstrong testified that even with these factors deleted from the rating process, Mr.

Hughes still had the best rating and that the elimination of these two factors did not change the ranking in any other projects that he reevaluated. There was also evidence that Hughes made no change in the proposal that he planned to submit after Attala County's data was posted on the website. Whether the action of the Department in posting the data on its website had sufficient impact on the bidding process to invalidate it is a fact issue. The hearing officer and the State Health Officer both found it did not sufficiently impact the process to invalidate it, and there is substantial evidence to support this conclusion. There is no evidence that the availability of the data caused Hughes to change his data, and without such evidence, the Court cannot override the decision of the SHO in this area.

¶61. This Court finds that there is no basis to reverse the decision of the chancery court affirming the decision of the hearing officer and the SHO. This issue is without merit.

## CONCLUSION

¶62. We find that the MSDH did not act arbitrarily or capriciously, or outside its authority, or violate any vested constitutional rights. The record also shows that the decision of the MSDH is supported by substantial evidence. Therefore, we affirm the judgment of the chancery court affirming the decision of the hearing officer and the State Health Officer to award of the certificate of need to Garry V. Hughes d/b/a the Kennington.

¶63. **AFFIRMED.**

**PITTMAN, C.J., SMITH AND WALLER, P.JJ., COBB, CARLSON AND DICKINSON, JJ., CONCUR. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**

19